ROY E. CUBBAGE, Appellant, v. STANDARD FIRE INSURANCE
COMPANY, Appellee.

**REFORMATION OF INSTRUMENTS:** Grounds—Mistake and
Fraud—Evidence—Insufficiency. Evidence reviewed, and held
wholly insufficient to show either fraud or mistake in the inser-
tion of a warranty clause in a policy of insurance.

*Appeal from Lee District Court.*—W. S. HAMILTON, Judge.

TUESDAY, MARCH 13, 1917.

REHEARING DENIED MONDAY, JUNE 18, 1917.

SUIT to reform a policy of insurance, and for judg-
ment thereon. On hearing, the petition was dismissed, and
plaintiff appeals.—*Affirmed.*

*Read & Read,* for appellant.

*William C. Howell,* for appellee.

LADD, J.—The policy insuring against
loss by fire was covered by property in
plant No. 2 of the W. D. Reeves Lumber Co.,
located at Helena, Arkansas, for the term
of one year from August 30, 1907. The
property burned January 9, 1908, and thereafter the claim
was assigned to plaintiff, who, in this suit, prays reforma-
tion of the policy by cancelling therefrom what is known
as "the warranty clause," and recovery of the stipulated
indemnity. This clause was stamped on the face of the
policy with a rubber stamp in blue ink, and reads:

"Warranty Clause. This policy is issued on the repre-
sentation and is a warranty by the assured that the Lumber
Insurance Company of New York has a policy, or policies,
in force on the identical property described herein to the
amount of at least $11,000 in form concurrent herewith on

the identical subject matter, and in identically the same proportion on each separate part thereof, and at no higher rate of premium. It is hereby further warranted by the assured and is a condition of this insurance that this policy is subject to same clauses, conditions, rates and proportions and will follow the same adjustment and settlement as that made on policy or policies as above issued by the Lumber Insurance Company of New York."

As so stamped, it covered a space 2½ inches one way and 4 inches the other, and the name of the "Lumber Insurance Company of New York," and the figures "11,000" were in large type. The warranty as stamped on the policy was alongside of a pink paper, describing the property insured, furnished by plaintiff's assignor, and made a part of the policy by being pasted thereon, the respective amounts of insurance being inserted opposite each description. It appears from the evidence that Helion Dickson, of Vicksburg, Mississippi, was agent of the insured in placing insurance on its property, and, as such, negotiated in behalf of the insured with W. L. Pettibone & Company, of New York City, who issued policies as recording agent in "Surplus Line Insurance;" that is, issued policies for insurance companies in states where the companies were not authorized to do business. The policy in suit was issued by Pettibone & Co., with the warranty clause stamped thereon as stated, and the petition alleges that plaintiff's assignor did not request or assent thereto, nor even know of the warranty clause until after the fire; that it was attached to the policy by defendant through mistake or fraud. The evidence disclosed that Dickson first applied to Pettibone & Co. in June or July, 1907, and on July 23d, following, Pettibone & Co. tendered insurance in four different companies, one of which was defendant. After some correspondence concerning financial standing of the companies, Dickson, on August 1st, furnished the plaintiff's description of the prop-

erty to be insured and requested policies of $1,500 in each of the insurance companies previously named. Pettibone & Co. answered, August 10th, requesting Dickson to fill out enclosed applications to furnish information from which to prepare the policies, adding, "Please be particular to name the companies and the amount which can be used for warranty." On the 27th, Dickson wrote Pettibone a letter, saying, in part:

"Practically all the better surplus line offices in New York are full on this risk, embracing all of the companies of Jameson & Frelinghuysen, Starkweather & Shepley, Crum & Forster, Vedder Underwriting Company, J. W. Durbrow, Dickson & Tweeddale, Daniel Woodcock, T. A. Duffey and a number of others. We enclose you herewith forms for both mill plants and Yard No. 1. You may send me as much as $7,500 on each mill, and $5,000 at the present time on Yard No. 1, rate $2.75. I will need additional insurance later on Yard No. 1 and 2, but just at this time the stock on No. 2 is decreasing. You need not in any wise fear this risk, because it·is only written by the better class of companies, and a loss or unfavorable criticism of the assured has never existed. In order that I may determine my placing for this month on this risk, kindly wire me on receipt hereof how much you cover on each plant and on Yard No. 1, naming the companies. You are not authorized to offer this outside your own office, as I deal with all brokers direct in the placing of all business in my office."

Pettibone & Co. telegraphed, August 30th:

"Are covering $6,500 each mill, $5,000 lumber. Send list companies and amounts each risk naming one company and amount as warranty."

On the same day, a letter was sent, quoting the telegram, naming the respective companies, including defendant, issuing policies, and amount of each, and adding, "The Standard require a warranty company to be named on

their policy, which is the only company which required it." On receipt of this letter, Dickson inquired which company was meant by "Standard," and was answered in a letter dated September 5, 1907, "The Standard Fire of Keokuk," with the addition, "We have given you all the insurance we can take care of in our office," and, by way of postscript, "We are awaiting list of companies and amounts, naming Warranty Co." On September 9th, Dickson responded:

"I have your letter of the 5th inst., enclosing policies for the W. D. Reeves Lumber Company as stated, for which please accept thanks."

Dickson then was requested to furnish names of companies, with amounts of their policies, which might be used as warranty companies, and also was informed that the defendant company required "a warranty to be named on their policy," and that this was not exacted by the other companies. When in New York City, shortly before, he had called on the Lumber Insurance Company and found that he could obtain a $10,000 policy from it, but that it must be issued by a local agent at Helena, Arkansas. But Pettibone & Company was not aware of this, and appears to have made use of that company without so informing Dickson, who, though often requested, had furnished the names of none for purposes of warranty. True, he named agencies, of which, doubtless, Pettibone & Co. was aware, and possibly some of these might, from a search of their records, have advised the firm as to policies issued on the insured's property. That firm had informed Dickson, however, that defendant required a warranty company, and he knew that none had been furnished. The circumstance, then, that an English company had required such a clause on a policy previously obtained by him, and that he had never known of such a requirement by an American company, would have tended to fix the above facts in his mind rather than excuse forgetfulness. With the knowledge referred to, this

policy with the others came into his hands. Dickson testified that he did not know whether he, or anyone in his office, examined the policy when received; that it was registered by a clerk who had since died; "that there is nothing to prevent anyone seeing the warranty clause, and it is a mystery how it passed the Reeves Lumber Company and ourselves.  *  *  *  Q. I believe you said that you wouldn't say whether you examined this policy or not? A. I cannot say. I would say that I do not believe I could have and failed to see the warranty. Q. You think anyone would see it? A. I think any experienced man examining it would have seen it. I would have noticed if I had examined the policy.  *  *  *  Q. I note on the back of the policy Exhibit 'A,' there is a pencil notation which seems to be 'Mill 2;' in whose handwriting is that? A. Mine. Q. When did you put it there? A. The Lord only knows. Q. And these figures there? A. They are not mine. I don't know whose they are. Q. Would you say from this notation, 'Mill No. 2,' that you yourself probably received this policy when it went through your office? A. This stamp shows it went through my office. Q. Did you personally made that notation, 'Mill No. 2?' A. Yes, sir. Q. When did you do that? A. The Lord only knows; I cannot tell you. I should think about the time the policy came.  *  *  *  Q. You don't know whether you examined it (the policy)? A. I cannot swear to that but I must have had it. It bears my stamp, and 'Mill No. 2' is in my handwriting, so I must have had it. Q. You don't know whether you had it personally. A. I know I had it personally. There is my mill number on it, and it passed through my office."

The secretary of the insured testified that he customarily examined policies when received, to see that they were in standard form, and opened the policies to see that the insured's form describing the property had been used with-

out change, to ascertain the rates charged, and to satisfy himself of the standing of the company, and that he so examined the policy in suit; that this was the only policy endorsed as it was, among hundreds received by the company at different times, and that he did not discover the warranty clause until after the fire.

This evidence leaves no escape from the conclusions, then: (1) That plaintiff knew through Dickson that the defendant exacted the insertion in or endorsement on its policy of the warranty clause; (2) that, though repeatedly requested to furnish the names of companies and amounts of their insurance to insert in this clause, Dickson had not done so; (3) that the clause was stamped on the policy, not among conditions usually in fine print, but in a conspicuous place on the face of the contract, where anyone examining could not well overlook it; (4) that Dickson did examine the policy, as did also the secretary of the insured; and (5) that, had either of these agents of plaintff examined the policy, even casually, he must have observed the warranty clause. Surely, then, no fraud was perpetrated in attaching the clause to the policy precisely as plaintiff had been informed the defendant required. Nor was there any mistake made in doing so, for each party to the contract well knew that this would be done. If any wrong were committed, it must have been in inserting in the clause the name of the Lumber Insurance Company as the warranty company, and the amount of the insurance supposed to be carried by it. But defendant's agent had repeatedly requested the names of companies and the amounts of insurance carried by each, to be made use of in preparing this clause. Plaintiff's agent, Dickson, was aware that he had omitted to comply with the request. Upon receipt of the policy, he must have known that defendant's agent had inserted the name of some company or companies and the amount of insurance supposed to be carried, for he had been

advised that this was essential to the issuance of the policy. The transmission of the policy, then, to Dickson was a tender thereof with company named therein as the warranty company, and it was up to the plaintiff, through his agent, Dickson, or some other acting for him, to accept or reject the policy, as might be determined. It might be accepted and made valid by procuring a concurrent policy in the amount named from the Lumber Insurance Company, or rejected. Surely, there was no fraud in so tendering the policy, for this was practically the only course left to Pettibone & Co., as Dickson had persistently neglected to furnish information which would enable that firm to insert the names of companies actually carrying insurance on the property. The correspondence was such as to put Dickson on inquiry as to the name of the warranty company, and, in not directing his attention thereto, Pettibone & Co. cannot be said to have concealed anything. Had care even less than ordinary been exercised by plaintiff, through his agents, upon the receipt of the policy, the warranty clause and its contents must have been observed. The circumstance that the correspondence directed attention to the clause distinguishes the case from those excusing the assured from reading the application for insurance or policy. See *Fitchner v. Fidelity Mut. Fire Assn.*, 103 Iowa 276; *Chismore v. Anchor Fire Ins. Co.*, 131 Iowa 180; *Eckert v. Century Fire Ins. Co.*, 147 Iowa 507.

We are of opinion that the defendant was without fault, and the retention of the policy is attributable to the negligence of plaintiff's agents, and, therefore, that the district court rightly declined to reform the policy by striking therefrom the warranty clause.—*Affirmed.*

GAYNOR, C. J., EVANS and SALINGER, JJ., concur.