No. 21,643.

THE ALTON MERCANTILE COMPANY, *Appellant*, v. THE BOOTH PACKING COMPANY, of Baltimore, Md., *Appellee*.

### SYLLABUS BY THE COURT.

CONTRACT—*For Sale of Goods—Refusal to Deliver—Modification of Contract—Action for Breach.* Where an order for the sale of goods on time is accepted, but the vendor thereafter refuses to fill it except for cash, offering, however, a discount corresponding to the difference in time of payment, the buyer cannot refuse such offer and buy elsewhere, looking to the vendor for the difference in price, where the negotiations of the parties subsequent to the refusal to give credit resulted in an agreement to all the details of a cash sale, except that while the buyer tendered his check in exchange for a bill of lading of the goods, the vendor refused to ship them unless the check should be certified.

Appeal from Reno district court; FRANK F. PRIGG, judge. Opinion filed July 6, 1918. Affirmed.

*H. S. Lewis,* and *W. G. Fairchild,* both of Hutchinson, for the appellant.

*F. L. Martin, Van M. Martin,* and *John M. Martin,* all of Hutchinson, for the appellee.

The opinion of the court was delivered by

MASON, J.: The Booth Packing Company, of Baltimore, Md., accepted from the Alton Mercantile Company, of Enid, Okla., two written orders for goods, one dated April 4, 1916, for 350

cases of canned sweet potatoes, at 75 cents a dozen, and the other dated August 22, 1916, for 50 cases of canned spinach, at 95 cents a dozen. Each order contained these clauses: "Six months' guarantee against leaks and swells from date of invoice. . . . Usual allowance. Terms: Cash, less 1½ percent in ten days." On November 13, 1916, the buyer wrote asking when the seller intended to ship the sweet potatoes. Three days later the seller sent an answer saying that it was ready to ship the goods in accordance with the contracts, but added:

"We will, however, only ship these goods for cash, but will allow you in addition to the discount of 1½ percent a further discount of ¼ percent, which we trust will be satisfactory to you. Please let us have specific shipping instructions and your check for the value of the above goods at your convenience, and promptly upon receipt of which we will let the goods go forward."

The following correspondence then ensued.

November 20, buyer to seller:

"Answering yours of the 16th, we will want the sweet potatoes and spinach both labelled "The Alton Goods," and cases properly stencilled. Please see that labels are not used on the ends of the cases. These two items, together with the Webster-Butterfield canned goods, will complete a car which we would like to have forwarded Central Savannah line, Frisco, and upon receipt of bill of lading, we will be glad to remit you less 1¾ percent cash discount, which you have stated you will allow for immediate cash. You cannot expect us to forward the cash unless the bill of lading is in our hands. We are at a loss to understand your unusual request for remittances to be made before the goods are forwarded, but we are perfectly willing to avail ourselves of the additional cash discount, although it should be 2 percent. You may be aware that some canners are allowing 2 percent for immediate cash or the usual 1½ percent if remittance is made in ten days. We are very anxious for immediate shipment and trust that you will get the goods off to us at once. If you do not care to forward us the bill of lading, you might forward it to Griffith Brokerage Co., your agents, in Wichita, Kan., and we will send them our check, which they can forward to you, delivering us the bill of lading. Will you please explain your unusual request, as customary terms should certainly apply on this contract. Be sure and include all of the labels belonging to us in the car. Let us hear from you by wire, please, as to when you will make shipment."

November 23, seller to buyer:

"Replying to your letter of the 20th, we are inclosing herewith an invoice for the sweet potatoes and spinach we have sold you, on which we have allowed you 1¾ percent cash discount. As soon as we receive your certified check for this amount we will let the car go forward."

December 1, buyer to seller:

"We are sending check to the National Exchange Bank, Baltimore, for $600.51, to be given to you when you deliver them bill of lading covering shipment of the sweet potatoes and spinach. Please see that the cases are properly stencilled and that labels are not used on the ends of the cases and also include in the car the Webster-Butterfield canned goods and all labels and stencils that you have belonging to us. Please route Central Savannah line, care Frisco. You stated in your letter, November 23rd, that you would forward the goods on receipt of check, but we do not care to send it to you, as you might never ship them after receiving the check. We have just as much reason to doubt your honesty as you have to doubt ours, so we do not intend to put the check in your hands until the bill of lading is furnished. If you do not handle it in this way, this is our last offer and we will then file suit immediately for the fulfillment of your contract."

December 4, seller to buyer:

"We are in receipt of your letter of the 1st. The National Exchange Bank advised us to-day that they have received your check for $600.51. It is perfectly agreeable to us to deliver to them the bill of lading covering your order of sweet potatoes and spinach, together with goods from Webster-Butterfield Co., but before delivering them this bill of lading it will be necessary for them to be able to deliver us a certified check for the above amount. If you will refer to our letters you will find that this is the request we made upon you, namely, to forward us certified check. Immediately we are notified by the National Exchange Bank that they have received your certified check for the above amount we shall be pleased to comply with your request."

The buyer then sued the seller for breach of contract. The case was submitted upon the facts already stated, and upon admissions that "the terms of sale were thirty days net and ten days 1½ percent off," and that at the time of the alleged breach the market price of the sweet potatoes was $1 a dozen, and of the spinach $1.30 a dozen. Judgment was rendered in favor of the defendant, and the plaintiff appeals.

The written orders state the terms of sale to be "cash, less 1½ percent in ten days," which would seem to indicate that no extension of credit whatever—in the sense of the buyer parting with title before receiving payment—was contemplated, in which case the requirement that a certified check should be delivered before shipment would perhaps not have been outside of the substance of the original contract. But the admission that the terms of sale were thirty days net, with 1½ percent off for cash in ten days, must doubtless be held to show that

the words used in the order were by custom to be given that effect. A suggestion is made by the plaintiff that the matter is affected by the clause relating to the guaranty against leaks and swells, but we do not regard it as having any bearing on the controversy.

It has been held that where the vendor refuses to sell goods on credit in accordance with his contract, but offers to deliver them for cash at a reduced price, the reduction amounting to more than the interest for the time credit was promised, the buyer is bound to accept the offer, if he is able to do so, on the principle that he is required to take such action as he reasonably can to avoid damages or reduce their amount. (*Lawrence v. Porter*, 63 Fed. 62; see, also, as having a similar tendency, *Deere et al. v. Lewis et al.*, 51 Ill. 254.) The federal decision cited proceeds upon the hypothesis that the situation was such that the buyer could accept the offer without consenting to a modification of the contract and thereby waiving his claim for compensation on account of any loss he sustained through the vendor's violation of his agreement.

On the other hand it has been held, under similar conditions, that the buyer was not required to accept such an offer from the vendor, there having been no showing that he was able to make a cash payment, the court saying that there was no presumption to that effect. (*The Louis Cook Manufacturing Co. v. Randall & Dickey*, 62 Iowa, 244.) And a like ruling has been made irrespective of whether or not the buyer could have borrowed the money with which to make a cash payment. (*Coppola v. Marden, Orth & Hastings Co.*, 282 Ill. 281, 118 N. E. 499, reversing the appellate court, as well as the trial court.) Closely related questions have been decided in the same way on the ground that a purchase from the maker of the contract would have resulted in a waiver of its breach (*Campfield v. Sauer*, 189 Fed. 576), or that it might have exposed the buyer to the charge of having abandoned the first agreement. (*Havemeyer v. Cunningham*, 35 Barb. 515, 522.)

We regard it as unnecessary to determine whether the decisions cited can be reconciled, or which of them in the event of a conflict should be regarded as the sounder, because we think the judgment under consideration may be affirmed upon the particular facts presented, without going counter to the prin-

ciple by which the result was controlled in any one of the cases referred to.

The contention seems very plausible that the plaintiff must be deemed to have consented to a modification of the original contract. When the positive announcement was made that the defendant would not ship the goods except for cash, the plaintiff did not give notice of an election to stand upon the first agreement. On the contrary, it assumed that the goods would be sent, gave directions in that regard, proposed to exchange its check for the bill of lading, and claimed the benefit of the additional discount of one-quarter of one percent. If this did not constitute an acquiescence in the change of the contract from one for a sale on credit to a cash transaction, it is only because the plaintiff's proposal was to give its check instead of actual money for the title to the goods. That is a distinction which it hardly seems it should be allowed to urge. But assuming that it had a right to stand upon the very letter of its offer, and that the minds of the parties never met on a modification of the original contract, because the plaintiff tendered an ordinary check, while the defendant demanded a certified one, we think the difference between the two was not of such a character as to excuse the plaintiff from taking the goods offered by the defendant, and to authorize it to buy them elsewhere at a higher price and look to the defendant for the excess. The fact that the plaintiff was willing to give his personal check negatives any idea of any difficulty on its part in paying in cash. It could hardly be heard to say that it drew the check without having funds to meet it. No suggestion of that kind is made, or of any inability on its part to have the check certified. By doing so it would have changed its situation in no other respect than that it would have parted with the power of stopping payment. Manifestly the defendant was unwilling to ship the goods upon the receipt of an uncertified check for fear payment would be stopped. There is a suggestion that a controversy had arisen between the parties on another matter, and it seems probable that the plaintiff wished to remain free to hold the goods and the money both, to better its position in effecting an adjustment of the other matter. But however that may be, we conclude that the plaintiff's obligation to do all that it reasonably could to minimize its damages resulting from

the defendant's refusal to sell on credit required it to waive its right to stop payment on its check by having it certified, inasmuch as it had expressed its willingness to meet all the other conditions imposed upon it, and to accept the benefit of the additional discount. If it intended that the check should be paid it could have lost nothing by having it certified, and ordinary fairness would forbid its being heard to say that it had any other purpose.

The judgment is affirmed.